RICHARD ALAN DARBY *v.* STATE OF MARYLAND

[No. 173, September Term, 1967.]

*Decided March 20, 1968.*

The cause was argued before MURPHY, C. J., and MORTON, ORTH, and THOMPSON, JJ.

*Edward A. Palamara* for appellant.

*William E. Brannan, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Linthicum, Jr., State's Attorney for Montgomery County,* and *Page J. Dignam, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellant was convicted of robbery with a dangerous and deadly weapon by a jury in the Circuit Court for Montgomery County and sentenced to imprisonment for a term of 20 years.[1]

On appeal from the judgment the appellant contends:

   I  It was error to read the indictments to the jury.
  II  The crime of robbery with a dangerous and deadly weapon does not exist in Maryland.
 III  His arrest was illegal and evidence seized incident thereto was improperly admitted in evidence.
 IV  As his defense was "coercion and duress from [the] codefendant", evidence proffered by him relevant thereto

---

1. Although the appellant was charged jointly with Vincent Roe Bush under four indictments which were consolidated for trial, he was tried alone. He was convicted only under the first count of indictment No. 8127 pertaining to the robbery with a dangerous and deadly weapon of John T. Ricketts of $177.80, the property of Cary P. Spencer, trading as Spencer's Wheaton Plaza Shell, a gasoline station. Neither indictments Nos. 8128, 8129 and 8130, nor the docket entries pertaining thereto, are included in the record before us, but it appears that indictment No. 8130 charged assault with intent to kill Ricketts, that indictment No. 8128 charged robbery with a dangerous and deadly weapon of the attendant at another gasoline station and indictment No. 8129 charged assault with intent to murder that attendant. Before any evidence was proffered the State "abandoned" the second count of indictment No. 8129, it being "word for word the same" as the 5th count in indictment No. 8128. At the conclusion of all the evidence, upon motion of the State, a nolle prosequi was entered as to indictments Nos. 8129 and 8130 and the jury was so informed. The jury found the appellant not guilty of the offenses charged in indictment No. 8128.

was improperly excluded, and the court erred in its instructions to the jury by failing to instruct on that issue.

## I

Before any testimony was taken counsel for the appellant said, "We contemplate not reading—waiving the reading of the indictment." The court pointed out that the jury takes the indictments into the jury room with them when they retire to deliberate, whereupon counsel said, "If the court feels that the indictments should be read, then would it instruct the clerk not to read the counts that were stricken." The court replied, "The Court doesn't think it is proper that one charged with a criminal offense that the charge not be read to the Jury under the regular form that the clerk uses, so for that reason, the court will not grant your motion to waive the reading of the indictments." The clerk read the indictments to the jury. It appears that the only count then "stricken" was the second count of indictment No. 8129 which apparently was "word for word the same" as the 5th count in indictment No. 8128. In its instructions to the jury the court stated that "the second count in 8129 has been abandoned." It said, "The fact that one has been indicted by the Grand Jury raises no presumption of guilt merely because a grand jury charges a person with a crime, it doesn't mean he is guilty and you cannot infer that he is guilty because he has been indicted under the laws of this State." At the conclusion of the charge, it said, "The fact that I am referring to all these counts and these indictments as such is not to be construed as an inference that you are to make any findings of guilty or not guilty because you are the sole judges of the law and the fact." Upon the entry of a nolle prosequi to indictments Nos. 8129 and 8130 the court so informed the jury and it appears that they took only indictments Nos. 8127 and 8128 into the jury room and without objection.

Md. Rules, 558 a, provides:

"Upon retiring for deliberation, the jury may take with them into the jury room such of the pleadings, granted prayers or written instructions, and exhibits which have been received in evidence, as the court

> may deem necessary for a proper consideration of the case."

"The jury may also take with them notes of the testimony or other proceedings taken by themselves but none taken by any other person", Rule 558 b, but "[a] deposition may not be taken into the jury room, except by agreement of all parties, and with consent of the court", Rule 558 d. The provisions of Rule 558 apply to a criminal case, Rule 757. " 'Pleading' means any paper filed in any action * * *" as set forth in Rule 5 v, but "action" does not include a criminal proceeding, Rule 5 a. Therefore the Maryland Rules do not provide by express terms that the jury may take the indictment into the jury room. By the provisions of Rule 756 b and c, with the provisos therein set out, the court may and at the request of any party shall, give such advisory instructions to the jury as may correctly state the applicable law and in giving such advisory instructions may make such summation of or references to the evidence as may be appropriate in order to present clearly to the jury the issue to be decided by them. It is the accepted practice in this State for the court in its instructions to refer to the counts in the indictment in stating the applicable law and referring to the evidence, and we think it proper to do so. It is obvious that the jury in a criminal proceeding must be informed of the charges against a defendant in order to assess the evidence and apply the law in relation to the charges. We see no reason why, in the discretion of the trial court, this information cannot be conveyed to the jury by the indictment itself, by it being read to them and by the taking of it into the jury room. Of course, the court should inform the jury before it retires of those counts not before them by reason of the granting of motions of judgment of acquittal or otherwise, and we deem it advisable that the court state to the jury, as it did in the instant case, that the fact of indictment raises no presumption of guilt. We feel that it was not prejudicial error for the clerk to read the indictments to the jury in the instant case. We think that the Maryland Rules do not compel a holding to the contrary and find support for our holding in *Delcher v. State,* 161 Md. 475 and *Bell v. State,* 200 Md. 223. And we note that Wharton, in his

*Criminal Law and Procedure* (Anderson), Vol. 5, § 2033, p. 178 says:

> "The practice sometimes adopted of reading the indictment or information to the jury as part of the prosecutor's opening statement has been criticized but held not prejudicial error."

The weight of authority in other jurisdictions is in accord with our view.[2]

## II

At the trial the appellant moved to dismiss the first count in each of indictments No. 8127 and No. 8128 charging robbery with a dangerous and deadly weapon, claiming that the offense charged is not a crime in Maryland. He urges that such offense was not a crime at common law and is not made a crime by statute. He argues that Md. Code, (1967 Repl. Vol.), Art. 27, § 488 does not "define a crime" but merely prescribes a penalty for a crime that does not exist. We agree that § 488 does not create a new substantive crime of "robbery with a deadly weapon." [3] The title to Chapter 457 of the Acts of 1927 reads as follows:

> "An ACT to add an additional Section to Article 27, of the Annotated Code of the Public General Laws of Maryland, title 'Crimes and Punishments', subtitle 'Robbery', to be known as Section 481-A, (now § 488) and to follow immediately after Section 481, to *prescribe increased penalties* for the offense of Robbery with a dangerous or deadly weapon." (emphasis added)

---

2. See: *Bruce v. United States*, 351 F. 2d 318 (5th Cir. 1965); *United States v. Press*, 336 F. 2d 1003 (2nd Cir. 1964); *Shayne v. United States*, 255 F. 2d 739 (9th Cir. 1958); *Urban v. State*, 387 S. W. 2d 396 (Tex. Crim. App. 1965)—but the indictment cannot be entered in evidence; *Stubblefield v. State*, 114 S. E. 2d 221 (Ga. App. 1960); *People v. Potter*, 49 Cal. Rptr. 892 (1966). Compare: *Getchell v. United States*, 282 F. 2d 681 (5th Cir. 1960).

3. In *Tender v. State*, 2 Md. App. 692 we noted, but did not reach, the question of whether § 488 created a distinct crime or merely increased the penalty for robbery when committed with a dangerous or deadly weapon.

The Act reads:

> "Every person convicted of the crime of robbery or attempt to rob with a dangerous and deadly weapon or accessory thereto, shall restore to the owner thereof the thing robbed or taken, or shall pay him the full value thereof, and be sentenced to imprisonment in the Maryland Penitentiary for not more than twenty years."

We think it clear from the language and form of the title (the capitalization of the first letter in "Robbery") and from the language of the Act that the Act merely provides a statutory penalty (and for the restoration of or payment for the thing taken) for the existing crime of robbery more severe when the robbery is committed with a dangerous or deadly weapon than when it is not. See *Hayes v. State,* 211 Md. 111, 115; *Jackson v. State,* 231 Md. 591, 593-594. Robbery is a crime in Maryland under the common law.[4] It is not defined by statute but the penalty is fixed by statute. Md. Code, *supra,* Art. 27, § 486; *Hayes v. State, supra,* p. 113. It thus retains its common law definition—"the felonious taking and carrying away of the personal property of another, from his person or in his presence, by violence, or by putting him in fear." *Clark and Marshall, Crimes,* (6th Ed.) § 12.09, p. 781. So at common law the crime was robbery whether or not the violence or putting in fear was by means of a dangerous or deadly weapon. "Or if a person with a sword drawn begs an alms, and I give it to him through mistrust and apprehension of violence, this is a felonious robbery." 4 *Bl. Comm.* 243. Section 488 clearly and simply provides that if the common law crime of robbery is committed with a dangerous or deadly weapon, the felon shall be subject to more severe punishment. The contention of the appellant that the section is indefinite and not "exacted with (such) exactness * * * (that) the public is able to know what act or acts are

---

4. Article 5 of the Declaration of Rights of the Constitution of Maryland declares "that the Inhabitants of Maryland are entitled to the Common Law of England * * *." See *State v. Buchanan,* 5 Har. & J. 317.

unlawful" is untenable.[5] Stripped of its meretricious attractions of logicality, it stands bare as a purely sophistical argument. There was no error in the denial of the motion to dismiss the counts charging robbery with a dangerous and deadly weapon.

## III

The police departments surrounding the Washington metropolitan area are connected by a mutual aid radio network, enabling any police department to broadcast to any other or all by "pushing activating tones. These tones activate receivers in other police departments. By hitting one button you can bring in a group of seven and talk to them all at one time." The police departments of Montgomery County and Prince George's County are connected with this "Quick Call System." In the early morning of November 4, 1966 the communications division of the Montgomery County Police Department received a telephone call regarding an armed robbery at the Gulf gasoline station on Rockville Pike (the robbery charged in indictment No. 8128). Police cars were dispatched to the location of the crime and the police received information from the station attendant and another witness that there had been an armed robbery of the attendant and a description of the robbers and the car used by them—"Two white males, one approximately five ten, bushy haired, scars around his eyes. He was wearing a red jacket. The other a little shorter; both white males, wearing a blue shirt, dark pants and had a dark colored gun and had left the scene in a dark, a black vehicle, which he believed at the time to be a Chevrolet with the gas cap missing." This information was given to the dispatcher at the communications division of the Montgomery County Police Department and he

---

5. Md. Code, *supra*, Art. 27, § 489 states a formula sufficient to use in an indictment for robbery with a dangerous or deadly weapon. This in no way affects our finding that § 488 does not create a substantive crime. The formula is in accordance with the generally accepted rule, recognized by this Court, that the purpose of a criminal charge, by indictment or otherwise, is to inform the accused of the charge he is called upon to defend and to protect him against a subsequent prosecution for the same offense. *Jackson v. State, supra,* p. 596; *Lank v. State,* 219 Md. 433, 436. A formula is also stated for robbery in § 487.

broadcast a lookout. About 1:30 A.M. the dispatcher received a call from John T. Ricketts, the attendant at the Shell gasoline station in the Wheaton Plaza Shopping Center (the robbery charged in indictment No. 8127). Ricketts reported he had been robbed and described the robbers and the car used by them. The dispatcher broadcast a lookout for this second "armed holdup" for "a 1956 or '57 Oldsmobile, black in color, occupied by two white males, middle or late 20's; one wearing a red jacket and the other wearing a blue shirt or black. It was last seen on South Georgia Avenue going towards 495." About 1:45 A.M. the dispatcher broadcast a lookout to the mutual aid network, making it "with special attention to the Prince George's and Fairfax County Police." This broadcast was "the same lookout on the 1956 or '57 black Oldsmobile, occupied by two white males in their middle or late 20's; one wearing a red jacket, the other wearing either a black jacket or a blue shirt; armed with what was believed to be a .25 caliber revolver; last seen going out on Georgia Avenue toward 495." At approximately 1:40 A.M. an officer of the Prince George's police department, patrolling in a radio car, received a radio call broadcasting the lookout. About 10 minutes later he saw a "black Oldsmobile '56, bearing Virginia tags," answering the description in the lookout. He followed it about four blocks and then stopped it. "Upon stopping the car the operator got out of the vehicle and walked back towards mine." He was wearing a "bright red jacket." The "tall man in the passenger side of the car was wearing "a bluish-gray type of shirt, woolen with long sleeves." Several other police cars arrived on the scene and the appellant and the passenger were arrested and the automobile searched. An automatic pistol was found under the right hand seat where the passenger was sitting, a clip for the pistol was found in the car and a suitcase containing a "change carrier" was recovered from the back seat of the car. The contention that the evidence seized by search of the car was improperly admitted in evidence because the arrest of the appellant was unlawful is without merit. An arrest may be made without a warrant, provided the arresting officer had probable cause to believe that a felony has been committed and that the person arrested committed it. *Gaudio and Bucci v. State,* 1 Md.

App. 455, 463. Probable cause for an arrest exists where the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Graham v. State,* 239 Md. 521; *Mulcahy v. State,* 221 Md. 413; *Michaels v. State,* 2 Md. App. 424. The facts and circumstances may come within the officer's knowledge by means of a lookout broadcast over the police radio system. *Lamot v. State,* 2 Md. App. 378, 384; *Crumb v. State,* 1 Md. App. 98, 107. We think it clear that the arresting officers in the instant case had probable cause to believe that a felony had been committed and that the appellant committed it. The arrest was therefore legal. *Barton v. State,* 2 Md. App. 52. The arrest being legal, the car under the control of the appellant was lawfully searched. *Stokes v. State,* 1 Md. App. 253; compare *Sedacca v. State,* 2 Md. App. 617. The evidence seized as a result of the lawful search was properly admitted in evidence.[6]

## IV

The appellant's defense to the charges against him was that he was forced by his companion, Bush, to participate in the robberies. He admitted in his testimony that the car used belonged to him and that the pistol used was registered in his name. He bought the pistol in March of 1966 for protection when he operated a service station (the permit authorized him to keep it in the station), and, although he went out of business in August 1966, on the night of the robbery he had the pistol under the front seat of his car. The appellant testified that he, and three other persons had spent the earlier part of the evening at a tavern, drinking beer and dancing. Bush had gone to the tavern with them in the appellant's car but was refused admittance

---

6. It appears that testimony proffered by the State on the issue of probable cause for the arrest was excluded on the ground that it was hearsay. We point out that on the issues of probable cause and the lawfulness of arrest and of the admission of evidence obtained through any search made in connection with the arrest, direct evidence to show the basis upon which the arresting officers acted, even if hearsay, is directly relevant and is admissible. *Nadolski v. State,* 1 Md. App. 304-308.

because of a fracas at the place several nights before in which he had been involved. So Bush sat in the car drinking beer supplied by the appellant. After they left the tavern about 11 :00 P.M., Bush and the appellant drove to a Texaco station in Rockville, allegedly so the appellant could request a mechanic he knew to be working there to accept a job with him (at the time the appellant was the manager of a motor and transmission specialty shop). The Texaco station was closed and he drove to the Adams Gulf station to get a dollar's worth of gasoline. He went to the men's room and when he returned Bush was sitting on a window sill in the back of the service station. "Bush jumped (the attendant) and pulled a gun." He took the attendant's money and a money changer. A bystander testified that Bush told the appellant to go get the car and bring it to the door and the appellant did so. A shot was fired but no one was hit. The appellant's version was that he "turned and headed out to go out to start my car (60 feet away) to go ahead and leave * * * I started the car up and Bush came running out of the service station with this gun, which at the time I noticed was my gun." He denied hearing a shot. He asked Bush for the pistol and Bush told him that if he tried to take it "he would blow my brains out." He drove toward the Shell station. During this time Bush had the pistol in his belt and "at no time, up to this point" had Bush pointed the pistol at the appellant's head or any part of his body. The appellant drove to the Shell station "because I had no cigarettes * * * I parked the car to keep Bush from coming into the station." The appellant walked into the service station "and asked for change for cigarettes." Bush had remained in the car but the appellant does not contend that he asked for help or attempted to escape. The attendant opened the cash register and "Bush came and held a gun on myself and Mr. Ricketts (the attendant) and told me to take the money and give it to him. He put the money in his pocket. Bush walked me and the other man out of the station with the gun and he told the man to run out to the woods and Bush and I walked to the car and I drove off." Ricketts testified that the appellant and Bush entered the station together. The appellant "wanted change for a ten dollar bill, which he handed me the ten dollars and I took it. As I was

getting his ten dollars change out of the cash register, the tall one (Bush) stepped around the short one and stuck a pistol in my ribs and said, 'This is a stick up. Give me all the money you got.' So, nothing I could do but give them the money. I give them all I had. The short fellow, (the appellant) * * * took—he took it all but the pennies * * * the short one took all the money but the pennies and he stepped through and walked on out of the Shell station and I guess he went and got in his car. The tall one, he didn't go. He said, 'Well you go, with me,' the tall one did. So, as I went out the door he said, 'Grab the bathroom key.' As I took the key he—I went around to the bathroom door with him. I was in front of him. He had had the pistol in my back. I did what the man told me and he told me to stay around there and he said if you poke your head out I'll blow it off. So I stayed around there. I didn't come out until after I seen him move away." The attendant then called the police.

We are not presented with the question of the sufficiency of the evidence to sustain the conviction, but, it is clear that the testimony of the victims and other witnesses and the tangible evidence admitted were ample for the jury to find the appellant guilty beyond a reasonable doubt of directly participating in the robbery and that he had not acted under "coercion and duress." But, even though the appellant himself realized by his own admission, in the words of his counsel, that "your story sounds fantastic, that this man had a gun and forced you to go and do these things", the issue was raised and was for the jury to determine.

On the issue of "coercion and duress" the appellant contends that "the exclusion of testimony from the jury that a co-defendant (Bush), not being tried, was confined in a mental institution was reversible error." During the appellant's direct examination he was asked, "Where is Mr. Bush now?" The State objected and the objection was sustained. He then testified that he and Bush were together in the Montgomery County Detention Center and that he was sent, by court order, to "Clifton State Perkins, which is the mental hospital for the State of Maryland." He was asked, "Where was Mr. Bush?" and the State's objection was sustained. There was no proffer as to

what the appellant's testimony would be in response to the questions to which objection was made and we cannot say that the trial court abused its discretion in sustaining the objections. See *Magness v. State*, 2 Md. App. 320, 324. The appellant proffered the testimony of "a noted neurologist and medical physician" to the effect that Bush was taken to the neurological clinic at Holy Cross Hospital where the physician examined him. The result of the examination was that Bush was suffering from traumatic epilepsy and "a chronic organic brain disease, a deteriorated condition, as a result of the use of alcohol." The physician examined records of the D. C. General Hospital which showed that Bush "suffered from a subdural hematoma and was operated on. He further examined the records from the Clifton T. Perkins Mental Hospital in the year 1965, where * * * Bush was committed * * * and the psychiatric case workup of * * * Bush at Clifton T. Perkins State Hospital for the examination which is presently being done * * *." In answer to a hypothetical question to be presented the physician would state that at the time of the robberies Bush was "a highly impulsive and dangerous individual." The State objected to the admission of the testimony proffered and the objection was sustained. We think the court acted properly within its discretionary power. Bush was not on trial. We do not feel that the fact that Bush was "highly impulsive and dangerous" was so relevant to the issue of "coercion and duress", under the circumstances here present, as to compel the admission of the excluded testimony. As was said in *Stewart v. State*, 1 Md. App. 309, 317 "[T]he real test of admissibility is the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue should be admitted." The rule as to exclusion of irrelevant evidence was stated by the Court of Appeals in *MacEwen v. State*, 194 Md. 492, 501 (quoted in *Huber v. State*, 2 Md. App. 245, 261) as follows:

"The application of the rule results in the exclusion of all evidence of collateral facts or of those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute; the reason being that such evidence tends to divert the

minds of the jury from the real point in issue, and arouse their prejudices."

We think that the proffered testimony met this test for exclusion.

At the conclusion of all the evidence counsel for the appellant stated that he did not wish the court to instruct the jury but the State requested that it do so. Therefore the court was obliged to instruct, Md. Rules, 756 b, and so informed counsel. Counsel for the appellant objected to any instructions. The charge to the jury did not contain a statement of the applicable law on the defense of duress and coercion. At the conclusion of the charge, defense counsel, out of the presence of the jury, said to the court, "[T.]he defense is put in the curious position of having to insist the Court instruct on duress and coercion. * * * I requested no instructions be given and I objected when the instructions were given. I am now left in the position of either having to instruct on duress or coercion, reading it myself but if I read it myself it doesn't have the strong effect as having come from the Court." He read into the record the instruction he then desired:

"Since it is essential to a crime that the defendant committed a voluntary act, it is a defense as to all crimes other than the taking of the life of an innocent person, that the defendant did not act voluntarily but acted under a compelling force of coercion or duress. In order to constitute a defense, the coercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. Mere fear or threat by another is not sufficient to constitute a defense."

The above quoted request for instructions was taken from 1 *Wharton's Criminal Law and Procedure,* § 123. The Court refused to give the instructions as requested by the appellant because it thought them incomplete. *Wharton* continues:

"The defense of duress is not established by proof that the defendant had been threatened with violence at

some prior time, if he was not under any personal constraint at the time of the actual commission of the crime charged. The defense cannot be raised if the apprehended harm is only that of property damage, or future but not present personal injury.

The compulsion must be of such a character as to leave no opportunity to the accused for escape. The doctrine of coercion or duress cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm.

The defense cannot be claimed if the defendant by his own fault or misconduct created the emergency or necessity which confronted him."

The court offered to read to the jury the entire statement from *Wharton* but counsel for the appellant said, "I would like the statement read that I just read into the record * * * I do not wish you to read the whole article." He objected to the instruction suggested by the court. The court said, "I am not going to piece meal it * * * I will instruct my way, not your way; not piece meal." Defense counsel replied, "Very well. I am going to have to do that because the weight of your words is so heavy, as Your Honor well knows." We conclude from the entire colloquy between the court and defense counsel that when defense counsel said, "Very well, I am going to have to do that * * *" he meant that he would have to object to the reading of the entire statement and that he did not want the court to give the instruction as suggested by it. The court acceded to his wishes. The appellant cannot now complain. Md. Rules, 756 f. We agree with the court that the instruction requested by defense counsel was incomplete and as such did not "correctly state the applicable law." This is so, particularly in view of the evidence before the jury from which it could properly find that the appellant had an opportunity to escape, that he was not under any personal restraint at the time of the actual commission of the crime and that he had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm. See *People v. Tallent*, 200 P. 2d 214 (Calif. 1948); *Shannon v. United States*, 76 F. 2d 490

422

(10th Cir. 1935); *Annotation,* 40 A.L.R. 2d 909, 911; *Perkins, Criminal Law,* (1957), p. 846; *Clark and Marshall, Law of Crimes,* (6th Ed.), § 5.16, pp. 325-329.

*Judgment affirmed.*